**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

TRISTIN LAWHORN,

                Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

CASE NO. 5:23-cv-00330

JUDGE JAMES S. GWIN

MAGISTRATE JUDGE AMANDA M. KNAPP

**REPORT AND RECOMMENDATION**

       Plaintiff Tristin Lawhorn ("Plaintiff" or "Mr. Lawhorn") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.    Procedural History

       Mr. Lawhorn filed his SSI application on February 19, 2021.  (Tr. 10, 200-05.)  He alleged a disability onset date of June 20, 2019 (Tr. 10, 200) due to depression, anxiety, and post-traumatic stress disorder (Tr. 63, 84, 95, 223).  After initial denial by the state agency (Tr. 80-84) and denial upon reconsideration (Tr. 93-95), Mr. Lawhorn requested a hearing (Tr. 96-99).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on May 18, 2022.  (Tr. 35-62.)  The ALJ issued an unfavorable decision on June 7, 2022, finding Mr. Lawhorn not

disabled.  (Tr. 7-29.)  The Appeals Council denied Mr. Lawhorn's request for review of the

ALJ's decision on January 11, 2023, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-6.)  Mr. Lawhorn then filed the pending appeal.  (ECF Doc. 1.)  The

matter is fully briefed.  (ECF Docs. 8 & 12.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Lawhorn was born in 1998.  (Tr. 22, 200.)  He attended high school through 11th

grade.  (Tr. 44, 223.)  At the time of the hearing, he was living with his mother and sister.  (Tr.

42.)  He worked a few jobs for very limited periods of time.  (Tr. 45-46.)  The longest job he

held was for six months in a retail store.  (*Id.*)  His last employment was in 2019.  (Tr. 46.)

### B.     Medical Evidence

#### 1.     Treatment History

Mr. Lawhorn received medication management and counseling services for his mental

health conditions at the Nord Center.  (*See generally* Tr. 288-327, 360-90, 391-415.)  His

diagnoses included: major depressive disorder, post-traumatic stress disorder, and cannabis,

opioid, sedative, and alcohol use disorders.  (*See e.g.*, Tr. 304, 328.)  His medications were

managed at the Nord Center by Robin Krause, DNP, CNP, CNS, (*see e.g.*, Tr. 304) every one to

three months (Tr. 328).  CNP Krause reported that she started treating Mr. Lawhorn in

September 2019.  (*Id.*; *see also* Tr. 294.)  In Mr. Lawhorn's Individual Service Plan from

September 30, 2019, Mr. Lawhorn stated he wanted to address his "depressive and anxious

symptoms."  (Tr. 294.)  Psychotherapy, medication management, and community psychiatric

supportive treatment were recommended.  (Tr. 294, 295.)

Mr. Lawhorn presented to CNP Krause on April 10, 2020,[1] for a telehealth medication management visit.  (Tr. 301-03.)  He reported he was doing well and that his mood was stable on Zoloft; he denied medication side effects and requested a refill.  (Tr. 301.)  He denied alcohol or recreational drug use, and reported he was sleeping and eating well.  (*Id*.)  On mental status examination, Mr. Lawhorn's speech was clear; his language was expressive and he had logical thought processes; he was alert with intact associations and oriented x3; his mood was euthymic with a full affect; his memory, insight, judgment, and fund of knowledge were fair.  (Tr. 301-02.)  He denied suicidal ideation.  (Tr. 302.)  Zoloft was continued for mood.  (*Id*.)

Mr. Lawhorn presented for a telehealth visit with CNP Krause on October 3, 2020.  (Tr. 304-06.)  He reported a "good response" from his medication and a stable mood.  (Tr. 304.)  He denied suicidal ideation and denied alcohol use or recreational drug use.  (*Id*.)  He requested an "emotional support letter."[2]  (*Id*.)  His status mental examination findings were unchanged from his April 10, 2020 visit.  (*Compare* Tr. 304-05 *with* Tr. 301-02.)  Zoloft was continued for mood and hydroxyzine hcl was prescribed for anxiety.  (Tr. 305-06.)

Mr. Lawhorn returned to CNP Krause for a telehealth visit a few days later on October 7, 2020.  (Tr. 307-09.)  He reported stopping his medication because it was not helping, and said he needed something for his anxiety and depression.  (Tr. 307.)  He reported calling the hotline for help with depression and anxiety and agreeing "to ESS [emergency stabilization services] for stabilization," but said he "wanted to leave and go back and stay with family" after he arrived.  (*Id*.)  He agreed to adjust his medication and reported using medical marijuana but denied using alcohol, sedatives, or opiates.  (*Id*.)  Mental status examination findings were similar to findings

---

[1] There are no treatment records cited by the parties between September 2019 and April 10, 2020.

[2] It is not clear from the record what the purpose of this letter was or whether one was provided.

from October 3, 2020, except his mood was depressed and anxious with a constricted affect. (*Compare* Tr. 308 *with* Tr. 305.)   CNP Krause prescribed Seroquel 25 mg.  (Tr. 308.)

Mr. Lawhorn followed up with CNP Krause on October 11, 2020, for a telehealth visit. (Tr. 310-12.)  He reported "feeling much better" on Seroquel, including "feeling less anxious, reduced racing thoughts, reduced anxiety, [and] some improvement with sleep[.]"  (Tr. 310.)  He denied suicidal ideation and reported he was clean and sober.  (*Id*.)  Mental status examination findings were unchanged, but CNP Krause observed improvement in Mr. Lawhorn's mood and affect with Seroquel.  (Tr. 310-11.)  She increased Seroquel to 50 mg.  (Tr. 311.)

When Mr. Lawhorn returned for a telehealth visit with CNP Krause on November 13, 2020 (Tr. 313-15), he continued to report that he was "feeling much better" on Seroquel (Tr. 313).  On mental status examination, his mood was now euthymic and his affect was full. (*Compare* Tr. 314 *with* Tr. 308, 311.)   Seroquel was continued.  (Tr. 314-15.)

During a telehealth session with CNP Krause on January 7, 2021 (Tr. 316-18), Mr. Lawhorn continued to report compliance with Seroquel (Tr. 316).  He reported he was doing "really well" and his "mood [was] stable."  (*Id*.)  He said he was "happy to have [his] son back in [his] life."  (*Id*.)  Mental status examination findings continued to show that Mr. Lawhorn's speech was clear; his language was expressive with logical thought processes; he was alert with intact associations and oriented x3; his mood was euthymic; his memory, insight, judgment, and fund of knowledge were fair.  (Tr. 316-17.)  Seroquel was continued.  (Tr. 317.)

When Mr. Lawhorn returned for a telehealth session with CNP Krause the following month, on February 5, 2021 (Tr. 319-21), he reported that he had stopped taking his Seroquel two days earlier because he was having difficulty swallowing (Tr. 319).  CNP Krause advised him to crush his tablet and mix it with applesauce so he could easily swallow it.  (*Id*.)  Mr.

4

Lawhorn agreed to do so.  (*Id*.)  Mental status examination findings were similar to his prior visit, except his mood was anxious and his affect was constricted.  (*Compare* Tr. 319-20 *with* Tr. 316-17.)  Seroquel was continued.  (Tr. 320.)

On March 2, 2021, Mr. Lawhorn participated in a telehealth counseling session at the Nord Center with Rachel Bartlett, LPC.  (Tr. 324-25.)  Mr. Lawhorn was "actively engaged in [the] session" and was receptive to working with the counselor.  (Tr. 324.)  He reported that he tried to "be positive" and knew "it effect[ed] a lot of things" when he was not positive.  (*Id*.)  He inquired about housing resources and LPC Bartlett assisted him with coordinating care with a case manager.  (*Id*.)  On mental status examination, Mr. Lawhorn had a "neutral" mood, a full affect, and logical thought processes; he was alert, oriented x4, and cooperative.  (*Id*.)  Mr. Lawhorn met with Brian Brimus, BA, QMHS, at the Nord Center on March 9, 2021, for a telehealth session to assess his case management goals.  (Tr. 322-23.)  He expressed interest in subsidized housing and a companion animal.  (Tr. 322.)

Mr. Lawhorn met with LPC Bartlett on March 29, 2021, for a telehealth counseling session.  (Tr. 326-27.)  He reported that he "recently had a show in Lorain and ha[d] been composing music."  (Tr. 326.)  He said he "felt good about this and the experience [had] overall improved his mood."  (*Id*.)  He reported his anxiety had been decreasing.  (*Id*.)  He rated his symptoms a three on a scale of 0-10, with ten being the worst.  (*Id*.)

On May 13, 2021, Mr. Lawhorn met with Emma Sonnerberg, LSW, for crisis psychotherapy at the Nord Center for a reported increase in symptoms after he stopped using marijuana two weeks earlier.  (Tr. 338.)  He was requesting placement at the CSU ("Crisis Stabilization Unit").  (*Id*.)  He reported chronic passive suicidal ideation with no plan or intent. (*Id*.)  Over the prior two months, he reported that he had experienced low frustration tolerance,

daily panic attacks, anhedonia, flash backs, self-isolating behavior, and avolition.  (*Id*.)  He also reported experiencing other symptoms since he stopped using marijuana, including a lack of appetite, fatigue, difficulty with sleep, flash backs, nightmares, excessive worry and guilt, racing thoughts, and restlessness.  (*Id*.)  He said he was under a lot of stress, reporting: "child removed from mom's custody, broke up with girlfriend of [one] year today, struggling to find work and housing, stress a lot about weight because . . . feels underweight."  (*Id*.)  On mental status examination he was cooperative and actively engaged.  (Tr. 340.)  His mood was anxious and depressed.  (*Id*.)  He was tearful and shaking and expressed anxiety and depression.  (*Id*.)  He had a full affect.  (*Id*.)  He reported feeling "hopeless and misunderstood."  (*Id*.)  He reported visual hallucinations, stating he saw "little shadows or lights out of the corner of [his] eyes sometimes."  (*Id*.)  His thought processes were intact and he was oriented x4 with average speech.  (*Id*.)  His recent memory was poor and his remote memory was fair.  (*Id*.)  He was admitted to CSU for four days.  (Tr. 344, 455.)  He was prescribed Doxepin and Vistaril.  (Tr. 455.)

After his discharge from Nord Center's CSU, Mr. Lawhorn presented to the MercyHealth emergency room department a few days later on May 18, 2021.  (Tr. 455.)  He reported that he had only taken his Vistaril that day, and had taken no other medications since he was discharged from Nord.  (Tr. 455-46.)  He reported that he was experiencing flashbacks of being held at gunpoint and reported that his flashbacks and anxiety were "much worse" than before his admission at the Nord Center.  (Tr. 456.)  He was admitted to MercyHealth, and discharged four days later, on May 22, 2021.  (Tr. 456-57.)  He was prescribed Haldol for extreme agitation, Trazodone for insomnia, and Vistaril for anxiety.  (Tr. 469.)  Mental status examination findings at discharge revealed that he was attentive with good eye contact.  (Tr. 461.)  His speech was spontaneous with a normal rate and volume.  (*Id*.)  His mood was euthymic with a mood

congruent affect.  (*Id*.)  His thought processes were goal directed.  (*Id*.)  His concentration and memory were intact.  (*Id*.)  His insight was good and his judgment was fair.  (*Id*.)  His fund of knowledge was adequate.  (*Id*.)  At discharge, his primary diagnosis was bipolar depression. (*Id*.)  He was discharged in stable condition (Tr. 457).

Mr. Lawhorn followed up with CNP Krause on May 28, 2021, for a telehealth visit.  (Tr. 353-55.)  He reported feeling better, with a stable mood, and denied anxiety and depression. (Tr. 353.)  He was sleeping and eating well and denied suicidal and homicidal ideation.  (*Id*.)  He reported he had quit marijuana two and a half weeks earlier because he wanted to regain custody of his children.  (Tr. 353.)  Mental status examination findings reflected clear speech and expressive language with logical thought processes; he was alert, with intact associations, and oriented x3; his mood was euthymic; his affect was constricted; his memory, insight, judgment, and fund of knowledge were fair.  (Tr. 354-55.)  Prescriptions from his MercyHealth admission––Trileptal, Seroquel, and hydroxyzine—were continued.  (Tr. 353, 354.)

During a telehealth counseling session with LPC Bartlett on July 26, 2021 (Tr. 382-84), Mr. Lawhorn reported that "everything [was] good for the most part," but that he felt "slightly down due to 'everyday seem[ed] the same' as he [was] limited on where he [could] go/what he [could] do" (Tr. 384).  He said he felt his depression was "situational."  (*Id*.)

Mr. Lawhorn met with LPC Bartlett again on August 11, 2021.  (Tr. 374-76.)  He reported a low mood because he was limited in what he could do by a lack of money and transportation.  (Tr. 376.)  He also reported that he was spending more time composing music, was not interested in employment, was applying for SSI, and was unable to do anything because he did not have a car.  (*Id*.)

7

Two weeks later, on August 26, 2021, Mr. Lawhorn presented for a telehealth appointment with CNP Krause.  (Tr. 364-73.)  He reported he was doing well, with a stable mood, and that his sleep and appetite were good.  (Tr. 365.)  He denied suicidal ideation and denied alcohol or drug use.  (*Id*.)  On mental status examination, his speech and language were within normal limits; his mood and affect were euthymic and congruent; his attention, concentration, and thought content, process, and cognition were within normal limits; his associations were intact; he was oriented to person, place, time, and situation; his fund of knowledge was within normal limits; his insight and judgment were good; and his memory was intact.  (Tr. 366-68.)  He denied suicidal or homicidal ideation.  (Tr. 367.)  He was diagnosed with major depressive disorder, PTSD, and history of cannabis use.  (Tr. 368.)  CNP Krause described his conditions as: "chronic illnesses with exacerbation, progression, or side effects of treatment."  (*Id*.)  The following medications were continued: Seroquel, Trileptal, and Vistaril.  (Tr. 369-70.)  CNP Krause directed Mr. Lawhorn to follow up in two months.  (Tr. 369.)

Mr. Lawhorn continued with counseling.  He met with LPC Bartlett on September 14, 2021, for a telehealth session.  (Tr. 360.)  He reported that he had been "feeling 'really good.'" (Tr. 362.)  He said he had been "getting out of the house, where as before he would isolate and stated it [was] somewhat 'self-inflicted.'"  (*Id*.)  He said that his anxiety had been under control "aside from being in large stores, where he experience[d] 'stimulation overload' because he watch[ed] what others [were] doing."  (*Id*.)

When Mr. Lawhorn met with CNP Krause for a telehealth session on January 12, 2022, he said: "I am doing well.  No complaints.  No mood swings."  (Tr. 395.)  He denied suicidal ideation, alcohol or drug use, depression, irritability, anxiety, and racing thoughts.  (*Id*.)  He said he was sleeping eight hours and his appetite was good.  (*Id*.)  He reported compliance with

medications with no side effects.  (*Id*.)  He said he was looking for new employment.  (*Id*.)  His

mental status examination findings were similar to those observed in August 2021 (*compare* Tr.

397-98 *with* Tr. 366-68) and his diagnoses were unchanged (*compare* Tr. 399 *with* Tr. 368).

The following medications were continued: Seroquel, Trileptal, and Vistaril.  (Tr. 400.)  CNP

Krause directed Mr. Lawhorn to follow up in two to three months.  (*Id*.)

 Mr. Lawhorn continued to see LPC Bartlett for telehealth counseling sessions in early

2022.  When Mr. Lawhorn met with LPC Bartlett on February 3, 2022 (Tr. 404-07), he reported

that he was "highly engaged in creating music" and felt that it had "improved his overall mood

and [felt] he was [was] utilizing his strengths" (Tr. 406).  He noted that he sometimes

approached music as "all or nothing" and got "burnt out," but that he wanted to "take more

breaks and be mindful in the process to prevent" that from occurring.  (*Id*.)  LPC Bartlett noted

some improvement in Mr. Lawhorn's ability to extinguish irrational beliefs and conclusions that

contributed to his anxiety and depression, and moderate improvement in his ability to identify

areas of interest and strength and get involved in activities that utilized his strengths.  (Tr. 404.)

 Mr. Lawhorn returned for telehealth visits with LPC Bartlett on February 22, 2022 (Tr.

408-10) and March 24, 2022 (Tr. 411-14).  During his February 22, 2022 session, he reported no

changes since his last appointment and said that he continued to feel his symptoms were being

managed.  (Tr. 409.)  During his March 24, 2022 session, he reported stress relating to

involvement of CPS and conflicts with his son's mother, which he indicated were barriers to his

relationship with his son.  (Tr. 412.)  He had received notice that his son's foster parents were

filing for permanent custody, and he felt he was treated unfairly by children services because he

was a male and had been prevented from seeing his son.  (Tr. 413.)  He said children services

had been involved with his son's mother on several occasions, and he felt helpless because

children services did not communicate with him.  (*Id*.)  He said he would continue to follow up with the case worker to try to get answers.  (*Id*.)  Despite the reported stressors, he reported "reconnecting with a brother" and that "his mood continued to increase and stabilize."  (*Id*.)  He also shared that he had released his mix tape and received positive feedback.  (*Id*.)

### 2.    Opinion Evidence

#### i.    Treating Source Opinion

On May 19, 2021, CNP Krause completed a Mental Residual Functional Capacity Assessment.  (Tr. 328-330.)  She reported treating Mr. Lawhorn since September 23, 2019, and seeing him for thirty minutes every one to three months.  (Tr. 328.)  CNP Krause listed the following diagnoses: major depressive disorder, post-traumatic stress disorder, cannabis use disorder, opioid use disorder, sedative use disorder, and alcohol use disorder.  (*Id*.)  She stated that Mr. Lawhorn was responding to the following medications: Seroquel, Doxepin, and Vistaril. (*Id*.)  She opined that he would be off task 20-25% of the time during an eight-hour workday. (*Id*.)  When asked to comment on Mr. Lawhorn's ability to sustain an eight-hour workday, five days per week, CNP Krause stated:

> [Mr. Lawhorn] has improved mood, improved focus and attention.  He still struggles with distraction due to depression and anxiety.  He is working on clean and sober lifestyle choices.  He verbalizes understanding that clean and sober lifestyle is necessary for maximum recovery.

(*Id*.) CNP Krause opined that it was likely that Mr. Lawhorn would be absent from work each month 25% of the time.  (Tr. 329.)  CNP Krause added additional comments regarding Mr. Lawhorn's limitations, stating he was struggling with continued mood swings and anxiety but had made improvements.  (Tr. 330.)

CNP Krause also opined that Mr. Lawhorn would be *moderately* limited in the following work-related activities: ability to remember locations and work-like procedures; ability to

understand and remember very short and simple instructions; ability to carry out very short and simple instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; and ability to interact appropriately with the general public.  (Tr. 329.)  She then opined Mr. Lawhorn would be *markedly* limited in the following work-related activities: ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or make plans independently of others.  (Tr. 329-30.)

**ii.     State Agency Psychological Consultants' Opinions**

On April 7, 2021, state agency psychological consultant Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 65) and Mental RFC Assessment (Tr. 66-68).  In the PRT, Dr. Tangeman opined that Mr. Lawhorn would have moderate limitations in his ability to: understand, remember or apply information; interact with others; concentrate persist or maintain pace; and adapt or manage oneself.  (Tr. 65.)  In the Mental RFC Assessment, Dr. Tangeman opined that Mr. Lawhorn:

- would be capable of performing simple, routine (one to two step) tasks, but would have difficulty completing more complex and detailed tasks (three to four step) if his symptoms of anxiety and trauma exacerbated while at work;

11

- would have difficulty maintaining attention and pace if faced with psychologically based symptoms while at work, and would benefit from having the option to take more frequent break periods if his symptoms worsened;

- would benefit from working in a more isolated position with infrequent superficial contact with the general public, and would benefit from no over the shoulder scrutiny and having a supportive supervisory system for goal setting and task management;

- would require prior notice of changes in the work place; he would do well in a low pressure work environment and he would not do well in a fast paced, rapidly changing environment.

(Tr. 67-68.)

On July 5, 2021, upon reconsideration, state agency psychological consultant Vicki Warren, Ph.D., affirmed Dr. Tangeman's PRT and Mental RFC findings.  (Tr. 74-78.)

**C.  Hearing Testimony**

**1.  Plaintiff's Testimony**

Mr. Lawhorn testified in response to questioning by the ALJ and his representative at the May 18, 2022 telephonic hearing.  (Tr. 42-57.)  He said he lived with his mother and sister, explaining that his sister had multiple medical conditions and needed assistance from their mother for daily living activities.  (Tr. 42.)  His mother asked for his help with things around the house (Tr. 43) and he helped with "the dishes and cleaning the house and stuff like that" (Tr. 49).  He also liked to cook.  (Tr. 49-50.)  He was unable to complete high school because he became homeless at age seventeen.  (Tr. 44.)  He had a four-year-old child he did not get to see and was without a driver's license due to child support.  (Tr. 44-45.)

Mr. Lawhorn said he was unable to work because he had "a real hard time being around a lot of people for more than a certain period of time."  (Tr. 47.)  He would start to get "really anxious" and his anxiety sometimes led to flashbacks.  (*Id*.)  He said there were "weeks at a time" when he could not "seem to get out of bed to shower let alone go outside and be a part of

society[.]" (*Id*.)  He described panic attacks that caused his chest to hurt "really bad," and it felt like his chest was "caving in and everything around [him] [was] getting smaller." (*Id*.)  He was taking medication for his panic attacks and said "they work as needed, I guess." (*Id*.)  His panic attacks did not occur consistently or all day, but it was "really hard" for him "to even go grocery shopping" because he "literally [left] the house once a month long enough for [his] grandmother to take [him] grocery shopping because his mom [could not] leave [his] sister." (Tr. 47-48; *see also* Tr. 49.)  He went to the grocery store with his grandmother because she could not go alone due to having COPD and being on oxygen. (Tr. 49.)  Although doing laundry was a "little . . . anxiety provoking" for him, he was able to help with laundry because the laundry room was "literally right outside of [their] door . . . so it[] [was] not like [he] [had] to worry about running into somebody or whatever." (Tr. 50.)  Mr. Lawhorn also described problems with concentration and said his mind wandered. (Tr. 48.)  He explained he was depressed due to not feeling "good enough," which he felt stemmed from being homeless for years not being able to see his son and take care of him like a father should, and due to significant dental problems. (*Id*.)

Mr. Lawhorn said he received counseling services through the Nord Center once or twice a month, depending on how bad his symptoms were. (Tr. 49.)  He reported his counselor was flexible and it was "nice to have somebody that [could] answer when [he] [felt] like he need[ed] to discuss something." (*Id*.)  He also testified to receiving medication through the Nord Center for PTSD and anxiety. (*Id*.)  He said that his medication caused drowsiness, which in turn affected his ability to stay "alert and pay attention" and focus. (Tr. 54-55.)  He estimated he was able to focus at the most for an hour, after which he would "start getting headaches and the drowsiness usually t[ook] over" and that he could not "really concentrate too much." (Tr. 55.)  If he was performing a simple task that took about a half an hour, he said that he would need to

take a break for about a half an hour.  (*Id*.)  He also said he had problems getting along with other people.  (Tr. 55-56.)  When he separated from his employment with Walmart, he said he was given "the choice between being fired or just leaving on [his] own because of an altercation with an employee that was there."  (Tr. 56.)  He testified that there were times when he would stay in his room for two to three weeks and shower only once a week.  (Tr. 56-57.)  He also reported having some manic phases.  (Tr. 56.)

Mr. Lawhorn testified that he had a "really messed up sleeping schedule."  (Tr. 50.)  He usually went to bed between 5:00 a.m. and 8:00 a.m. and woke up between 4:00 p.m. and 6:00 p.m.  (*Id*.)  He reported that he typically spent his days in his room making music.  (Tr. 50-51.)  He also spent about half of his day playing video games on his phone.  (Tr. 51.)  He sometimes watched movies with his mom and sister.  (*Id*.)  He said he smoked Delta 8 marijuana a few times each month and did not need a medical card for it because it was in the "hemp, CBD category" and legal.  (Tr. 52.)  He said he did not use any other substances.  (*Id*.)  He had one friend who lived out of state who he communicated with through Facebook (Tr. 53, 57) and another friend that he talked to on the phone (Tr. 57).

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 58-61.)  The ALJ found no past relevant work (Tr. 58, *see also* Tr. 46) and asked the VE whether there would be jobs available to an individual of Mr. Lawhorn's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 15, 58).  In response, the VE testified that the following jobs would be available: cleaner II; hand packager; and laborer, stores.  (Tr. 58-59.)  The VE also testified that there would be no work available if the individual needed at least two extra fifteen-minute breaks outside the normal break periods or if the individual would

14

be absent at least two times every month.  (Tr. 59, 60.)  The VE also testified that there would be no work available if the individual needed up to occasional intervention from supervisors or additional support or redirection.  (Tr. 59-60.)  Finally, the VE was asked to consider an individual who would be limited to occasional contact with supervisors and no contact with coworkers or the public.  (Tr. 59.)  The VE testified initially that the individual could perform the identified jobs of hand packager and cleaner.  (Tr. 60.)  Mr. Lawhorn's counsel clarified that he was talking about occasional "contact," not occasional "interactions."  (Tr. 60-61.)  If the individual could not have "contact," the VE testified that would require an isolated work setting and there would be no work available.  (*Id*.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

15

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.      The ALJ's Decision

In her June 7, 2022, decision, the ALJ made the following findings:[3]

1.      The claimant has not engaged in substantial gainful activity since February 19, 2021, the application date.  (Tr. 12.)

2.      The claimant has the following severe impairments: depression, anxiety, and post-traumatic stress disorder.  (Tr. 13.) The claimant has the following non-severe impairments: alcohol and drug use in sustained remission. (*Id*.)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-15.)

---

[3] The ALJ's findings are summarized.

16

4.     The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: perform simple, routine tasks, but not at a production rate pace, have frequent interaction with supervisors and coworkers and occasional interaction with the public, and is limited to routine workplace changes. (Tr. 15-22.)

5.     The claimant has no past relevant work.  (Tr. 22.)

6.     The claimant was born in 1998 and was 22 years old, defined as a younger individual age 18-49, on the date the application was filed.  (*Id*.)

7.     The claimant has a limited education.  (Tr. 23.)

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work.  (*Id*.)

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cleaner, hand packager, and store laborer.  (Tr. 23-24.)

Based on the above, the ALJ found Mr. Lawhorn had not been under a disability, as defined in the Social Security Act, since February 19, 2021, the application date.  (Tr. 24.)

## V.     Plaintiff's Argument

Mr. Lawhorn presents one assignment of error.  He argues the Commissioner's decision lacks the support of substantial evidence because the ALJ found the opinions of the state agency psychological consultants persuasive but failed to incorporate all opined limitations into the RFC and failed to explain why the limitations were excluded.  (ECF Doc. 8, pp. 8-12.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that she failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th

Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    Sole Assignment of Error: Whether Decision Lacks Support of Substantial Evidence Because ALJ Did Not Adopt All Limitations Contained in State Agency Psychological Consultants' Opinions Despite Finding the Opinions Persuasive**

In his sole assignment of error, Mr. Lawhorn argues that the Commissioner's decision lacks the support of substantial evidence because the ALJ found the opinions of the state agency psychological consultants persuasive but failed to either incorporate all of their opined limitations into the RFC or explain why certain limitations were excluded. (ECF Doc. 8, pp. 8-12.) The Commissioner argues in response that: the RFC is supported by substantial evidence; the record does not support the specified RFC limitations; and the ALJ had no obligation to explain why the specified limitations—which were stated using conditional language—were not included in the RFC. (ECF Doc. 12, pp. 4-6.)

The ALJ evaluated the persuasiveness of the opinions offered by the state agency psychological consultants Dr. Tangeman and Dr. Warren, as follows:

> I considered the opinions of the State agency consultants []. At the initial level, Paul Tangeman, Ph.D., and at the reconsideration level, Vicki Warren, Ph.D., opined moderate limitation in understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. The claimant would be capable of performing simple, routine (1-2 step) tasks but would have difficulty completing more complex and detailed (3-4 step) tasks if symptoms of anxiety and trauma were exacerbated while at work. The claimant may have difficulties maintaining concentration and pace if faced with psychologically based symptoms while at work and would also benefit from having the option to take more frequent break periods if these symptoms worsened. He would benefit from working in a more isolated position with infrequent, superficial contact with the general public, would benefit from no over-the-shoulder scrutiny and having a supportive supervisory system for goal setting and task management. The claimant would require prior notice of changes in the workplace and would do well in a low-

pressure work environment but would not do well in a fast-paced, rapidly changing environment.

<u>I find these opinions persuasive to the extent they are consistent with no more than moderate limitations in the Part B areas of mental status functioning and are supported by objective evidence of improved symptoms with treatment</u> []. These opinions are also consistent with examinations that indicated depression and anxiety but otherwise alert, oriented, and cooperative with logical thought process, expressive language, clear speech, and intact associations [].

(Tr. 21 (emphasis added) (citations omitted).)

As a general matter, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Indeed, even where an opinion was given great weight under the prior regulations, the Sixth Circuit noted that "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015). Nevertheless, Social Security Ruling (SSR) 96-8p requires the ALJ to consider all medical opinions in her RFC assessment and, where her assessment "conflicts with an opinion from a medical source," she "must explain why the opinion was not adopted." SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).

Mr. Lawhorn does not challenge the ALJ's evaluation of the persuasiveness of the state agency psychological opinions and acknowledges the general principle that an ALJ need not adopt a medical opinion verbatim. However, he contends that the ALJ did not comply with SSR 96-8p in this case because she did not explain why specific limitations in those opinions were not adopted, and further that she failed to build an accurate and logical bridge between the evidence and the result. (ECF Doc. 8, p. 12.) These arguments are addressed in turn.

20

1.      **Plaintiff Has Not Proven That the ALJ Failed to Comply with SSR 96-8p**

As to the ALJ's alleged failure to explain why specific limitations were not adopted, Mr.

Lawhorn focuses his argument on the following findings of the state agency psychological

examiners, as set forth in their opinions:

- "[Mr. Lawhorn] would also benefit from having the option to take more frequent break periods [i]f these [psychologically based] symptoms worsened."  (Tr. 67, 77.)

- "[Mr. Lawhorn] would benefit from working a more isolated position with infrequent, superficial contact with the general public."  (Tr. 68, 77.)

- "[Mr. Lawhorn] also has a h[istory] of lashing out verbally, and so would benefit from no over-the-shoulder scrutiny & having a supportive supervisory system for goal setting and task management." (*Id.*)

(ECF Doc. 8, p. 11.)  Mr. Lawhorn argues the omission of these limitations is significant because

when "these restrictions were presented to the vocational expert at the . . . hearing, the vocational

expert testified there would be no jobs for such an individual."  (*Id.* (citing Tr. 59-61).)

SSR 96-8p states the Social Security Administration's policies and policy interpretations

regarding the assessment of RFCs.  61 Fed. Reg. at 34474.  With respect to the ALJ's

consideration of medical opinion evidence, SSR 96-8p provides:

> The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

*Id.* at 34478.  In determining whether the ALJ violated this provision of SSR 96-8p in this case,

the Court is faced with the following questions: (1) did the RFC assessment *conflict* with the

state agency psychological examiners' opinions; and (2) if so, did the ALJ *explain* why the

relevant opinions were not adopted.  Those questions will be addressed in turn.

As to whether there was a *conflict* between the state agency opinions and the RFC, the

Commissioner notes that the opinion language in question indicated that Mr. Lawhorn "could

benefit" from specified limitations, not that he "needed" those limitations, and argues "the ALJ

[wa]s not required to identify a residual functional capacity that reflects optimal work conditions." (ECF Doc. 12, pp. 5-6.) Other district courts have characterized similar conditional language—that the plaintiff "would benefit," would "most benefit," or "may benefit" from specified conditions—as statements of "optimal conditions rather than necessary ones." *Horinek v. Saul*, No. 1:19-CV-2141, 2020 WL 4340987, at \*9 (N.D. Ohio July 7, 2020), *report and recommendation adopted*, No. 1:19CV2141, 2020 WL 4339327 (N.D. Ohio July 28, 2020); *see Hammons v. Comm'r of Soc. Sec.*, No. 2:21-cv-12933, 2023 WL 2263856, \* 2 (E.D. Mich Feb. 28, 2023) (quoting *Horinek*, 2020 WL 4340987, at \*9); *Duffield v. Comm'r of Soc. Sec.*, No 5:20-cv-1065, 2021 WL 1022449, \*12 (N.D. Ohio March 17, 2021) (same).

SSR 96-8p explains that an "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p, 61 Fed. Reg. at 34475 (emphasis in original). This is consistent with the regulations, which establish that an RFC "is the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). In this case, the state agency psychological consultants' statements that Mr. Lawhorn "would benefit" from certain conditions are best characterized as descriptions of "optimal conditions," not conditions that are necessary for Mr. Lawhorn to perform work-related tasks. *See Horinek*, 2020 WL 4340987, at \*9; *Hammons*, 2023 WL 2263856, at \* 2; *Duffield*, 2021 WL 1022449, at \*12. Because the state agency consultants did not identify the conditions in question as requirements for Mr. Lawhorn to do "the most [he] c[ould] still do despite [his] limitations," 20 C.F.R. § 416.945(a)(1), there is no conflict between the state agency opinions and an RFC that does not include those conditions. Given the absence of any conflict between the opinions and the RFC, Mr. Lawhorn has failed to prove a violation of SSR 96-8p.

Even assuming Mr. Lawhorn did show a conflict between the opinions and the RFC, the next question before the Court is whether the ALJ appropriately *explained* why the relevant opinions were not adopted.  *See* SSR 96-8p, 61 Fed. Reg. at 34478.  For the reasons set forth below, the undersigned finds the ALJ offered sufficient explanation to address any conflict.

Importantly, the ALJ did not find every part of the state agency consultants' opinions persuasive.  Instead, she found the opinions "persuasive *to the extent* they are consistent with no more than moderate limitations in the Part B areas of mental status functioning and are supported by objective evidence of improved symptoms with treatment."  (Tr. 21 (emphasis added).)  She explained that the persuasive parts of the opinions were consistent with mental status examinations showing depression and anxiety but otherwise normal findings.  (*Id.*)  The ALJ made similar observations earlier in the decision, noting:

> Aside from some findings related to mood and affect, the claimant's mental status examination findings demonstrated generally that the claimant maintained intact functioning and improved with treatment.

(Tr. 17.)  The ALJ had also previously observed that:

> the medical record does not establish functional limitations that would preclude the mental limitations stated [in the RFC]. The claimant followed a conservative course of treatment for impairments that resulted in improved and stable symptoms []. Moreover, the claimant showed some variable mood, anxiety, and PTSD symptoms but generally maintained intact system functioning. Therefore, mental limitations set forth in the mental residual functional capacity assessment are consistent with moderate limitation in the Part B areas of functioning and [] account for the claimant's social anxiety, depressed/low mood, and instances of visual hallucinations, nightmares, and flashbacks. Accordingly, I find the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this decision.

(Tr. 20-21 (citations omitted).)

A comparison of the state agency opinions and the RFC helps to clarify what parts of the opinions the ALJ found persuasive and consistent with no more than moderate limitations in mental functioning.  As to understanding and memory, the psychological consultants opined that

23

Mr. Lawhorn could perform simple, routine tasks but would have more difficulty completing more complex and detailed tasks (Tr. 67, 76) and the RFC limited Mr. Lawhorn to simple, routine tasks (Tr. 15).  As to concentration and persistence, the psychological consultants opined that Mr. Lawhorn may have difficulties maintaining concentration and pace and would benefit from an option to take more frequent breaks if symptoms worsened (Tr. 67, 77), and the RFC precluded jobs at a production rate pace (Tr. 15).  As to social interaction, the psychological consultants opined that Mr. Lawhorn would benefit from "a more isolated position with infrequent, superficial contact with the general public," "no over-the-shoulder scrutiny," and "a supportive supervisory system for goal setting and task management" (Tr. 68, 77), but the RFC limited him to frequent interaction with supervisors / coworkers and occasional interaction with the public (Tr. 15).  As to adaptation, the psychological consultants opined that Mr. Lawhorn would require prior notice of workplace changes and would do well in a low-pressure environment (Tr. 68, 77), and the RFC limited him to routine workplace changes (Tr. 15).

To the extent that any of the opinions above are found to "conflict" with the RFC, the ALJ explained in her decision that she only found the limitations described in the psychological consultants' opinions persuasive to the extent they were "consistent with no more than moderate limitations in the Part B areas of mental status functioning and are supported by objective evidence of improved symptoms with treatment."  (Tr. 21.)  She further explained that the limitations she adopted in the RFC were consistent with Mr. Lawhorn's "conservative course of treatment for impairments that resulted in improved and stable symptoms" and clinical findings demonstrating that "the claimant showed some variable mood, anxiety, and PTSD symptoms but generally maintained intact system functioning."  (Tr. 20.)  The undersigned finds the ALJ's

explanation was sufficient to comply with the requirements of SSR 96-8p.  Certainly, the conclusory arguments in Mr. Lawhorn's brief fail to prove otherwise.  (ECF Doc. 8, pp. 11-12.)

### 2.    Plaintiff Has Not Shown the Absence of a Logical Bridge

Mr. Lawhorn also argues that there is no logical bridge between the evidence and the RFC because the ALJ failed to include the specific concentration and persistence and social interaction limitations set forth in the state agency psychological consultants' opinions despite finding them persuasive.  (ECF Doc. 8, p. 12.)  While a decision will not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result," *Fleischer*, 774 F. Supp. 2d at 877, the undersigned finds that the ALJ provided the requisite logical bridge between the evidence and her RFC finding.

The ALJ considered in detail Mr. Lawhorn's mental health conditions, including his conservative course of treatment, generally positive and stable response to treatment, and the nature and extent of his social interactions and activities of daily living.  (Tr. 17-21.)  Regarding Mr. Lawhorn's limitations in concentrating, persisting, or maintaining pace, the ALJ explained:

> With regard to concentrating, persisting, or maintaining pace, the claimant has moderate limitation.  The claimant reported his depression causes lack of motivation and sometimes puts off personal care and daily tasks [].  He cannot pay attention for very long but mostly finish[es] what he starts and is able to watch movies and write music [].  He also routinely presented as alert and oriented with intact attention and concentration [].  He noted generally compliant with his treatment plan, including taking medications, and abstained from drug or alcohol use [].  Accordingly, I find moderate limitation in the ability to focus attention and stay on task at a sustained rate.

(Tr. 14 (citations omitted).)  As to social interaction limitations, the ALJ explained:

> In interacting with others, the claimant has moderate limitation. The claimant reported it is hard to be around people for more than a short period of time due to his mental impairments, [he] does not like to go outside, does not like to be alone, and has had altercations with another employee at a past employer [].  Still, he goes to the grocery store one to three times a month, although [he] travels a couple of cities away and tries to be very quick, lives at home with his mother, spends time

with his girlfriend almost every day, and has some friends []. He [was] noted to have some issues with anger and irritability but generally showed no difficulty interacting during examinations and presented as engaged and receptive []. Therefore, I find moderate limitation in the ability to interact with others independently, appropriately, effectively, and on a sustained basis.

(*Id*. (citations omitted).)  The ALJ also considered evidence that Mr. Lawhorn composed music and was able to perform at a show (Tr. 20), providing additional support for her finding of no more than moderate limitations in social interactions (Tr. 14, 21). The ALJ also concluded that the evidence of record showed conservative course of treatment, improved and stable symptoms, and generally intact system functioning notwithstanding some variability in mood, anxiety, and PTSD symptoms, explaining further:

[the] mental limitations set forth in the mental residual functional capacity assessment are consistent with moderate limitation in the Part B areas of functioning and [] account for the claimant's social anxiety, depressed/low mood, and instances of visual hallucinations, nightmares, and flashbacks. Accordingly, I find the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this decision.

(Tr. 20-21.)

Mr. Lawhorn contends that greater or more restrictive limitations should have been incorporated into the RFC because the state agency psychological consultants' opinions discussed additional limitations and the ALJ found their opinions persuasive.  However, as explained, the ALJ found the opinions persuasive only "to the extent they [were] consistent with no more than moderate limitations in the Part B areas of mental status functioning and [were] supported by objective evidence of improved symptoms with treatment."  (Tr. 21.)

For the reasons explained herein, the undersigned finds that the ALJ did not act contrary to the requirements in SSR 96-8p or fail to build a logical bridge between the evidence and the RFC, which was supported by substantial evidence.  Accordingly, the undersigned finds Mr. Lawhorn's sole assignment of error to be without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.


 January 25, 2024


/s/Amanda M. Knapp
_____
AMANDA M. KNAPP
United States Magistrate Judge



## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).